# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ROBERT L. DAVIS,

                                      Petitioner,

        v.

                                                 9:12-CV-1843

MARK BRADT, Superintendent                       (TJM/ATB)

                                     Respondent.

ROBERT L. DAVIS, Petitioner, pro se
LEILANI J. RODRIGUEZ, AAG, for the Respondent

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy, United States District Judge.

Presently before this court is a petition, seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Petition ("Pet.")) (Dkt. No. 1). Petitioner brings this action, challenging a judgment of conviction rendered on May 21, 2007, after a jury trial in the Onondaga County Court. Petitioner was convicted of two counts of Rape, First Degree; Kidnaping, Second Degree; Criminal Sexual Act, First Degree; Sexual Abuse, First Degree; and Robbery, Third Degree. Petitioner was sentenced as a second felony offender to consecutive prison terms of twenty five years for both counts of rape, the kidnaping, and the criminal sexual act; a seven year prison term for the sexual abuse; and an indeterminate term of three and one half to seven years for the robbery. The court also imposed five years of post-release supervision.

The Appellate Division, Fourth Department affirmed petitioner's conviction on September 30, 2011, and the New York Court of Appeals denied leave to appeal on December 15, 2011. *People v. Davis*, 87 A.D.2d 1332 (4th Dep't), *lv. denied*, 18 N.Y.3d 858 (2011).

Petitioner raises eight grounds for this court's review:

1.    DNA evidence was obtained in violation of the 4th Amendment. (Pet. at CM/ECF p.14).

2.    The prosecutor committed misconduct before the Grand Jury. (*Id.*)

3.    Petitioner's trial attorney was ineffective. (Pet. at CM/ECF p.20).

4.    "Hampering of deliberations" (*Id.*)

5.    The court improperly admitted false expert testimony. (Pet. at CM/ECF p.40).

6.    The court improperly admitted the false testimony of a lay witness. (Pet. at CM/ECF p.41).

7.    The court improperly admitted evidence of unrelated "dismissed" charges. (Pet. at CM/ECF p. 46).

8.    Two jurors were improperly removed from the case.  (Pet. at CM/ECF p. 46).

Respondent has filed an answer in opposition to the petition, together with the pertinent state court records and a memorandum of law. (Dkt. Nos. 10, 11).  The state court records have been submitted under seal due to the nature of petitioner's crimes. (Dkt. Nos. 8, 9).  Petitioner has filed a traverse with exhibits. (Dkt. No. 19).  For the following reasons, this court agrees with respondent and will recommend dismissal of

the petition.

## DISCUSSION

### I.   Relevant Facts

The petitioner's conviction in this case resulted from a rape and robbery that occurred on April 25-26, 2006 at the Dry Dock Grill in Syracuse, New York. The victim ("RC") worked the night shift as the bartender at the time of the incident. Her job included closing the bar at approximately 10:00 p.m. (RC – Trial Transcript ("T")[1] 22-23). On April 25, 2006, she arrived for work at 5:00 p.m. to work her normal evening shift. (RC – 428). The cook left at 8:00 p.m., leaving RC with several regular customers in the bar. (RC – T. 428-29) By 8:30 p.m., the only people in the bar were RC and a cab driver named Dan. (RC – T. 430).

A short time later, Jimmy Spencer ("Spencer"), an executive with Excellus Blue Cross Blue Shield came into the bar and ordered a beer from RC. (RC – T. 432, Spencer – T. 749). She served him the beer and went back to watching television. (RC – T. 431). Spencer testified at trial that, while he was drinking his beer, petitioner came into the bar, showed RC some money and asked if he had enough to purchase a drink. When RC told petitioner that he did not have enough money, Spencer offered to buy him a drink. RC testified that she felt uncomfortable when the petitioner entered, and gave Spencer a "dirty look" when he offered to buy petitioner the drink, but poured petitioner a "Jack and coke." (RC – T. 433-34). She testified that after

---

[1] The trial transcript has been filed as three "sealed" documents on the court's electronic filing system. The citations are to the transcript pages that appear at the upper right hand corner of the transcript and are the original page numbers.

pouring petitioner the drink, she walked away, trying to stay busy and finishing her paperwork in preparation for closing the bar. (*Id.*)

Dan left, and shortly thereafter, a blonde woman, Mary Jo Marcely ("Marcely") came into the bar to meet Spencer. (RC – T. 434, Spencer – T. 758-61). She and Spencer were co-workers, and had been in Rochester that day for a meeting. (Marcely – T. 866). She arranged to meet Spencer at the Dry Dock to discuss some work matters. (Marcely – T. 868, Spencer – T. 758-59). RC testified that she went into the office to get her keys and her bag, and met her nephew at the back door of the bar so that he could give her some change from a gift that he had purchased for RC's sister. (RC – T. 436-37). When RC returned to the bar, she noticed that Spencer and Marcely had gone, leaving RC alone with petitioner. (RC – T. 438).

RC testified that she just ignored the petitioner, thinking that he was just going to leave. She tried not to look at him and did not speak with him. (*Id.*) When RC came out from behind the bar to access the credit card machine, petitioner came up from behind her and put his arm around her neck. (RC – T. 439-40). Petitioner was much taller and stronger than RC, and he pushed her toward the kitchen. She was shaking, and petitioner told her to stop shaking and calm down. (RC – T. 440-41). Petitioner asked RC what was in the office. She told him that there was money in the cabinet, and that he could "take all the money." (RC – T. 444). RC told him that the keys were at the bar. They obtained the keys, and petitioner ordered her to lock the front door. (RC – T. 444-45).

Petitioner dragged RC back to the bar, took money out of a "Quick Draw"

machine and from the cash register, stuffing the money into his pants pocket. He brought RC back into the office, where he ordered her to unlock the cabinet where the money was kept. (RC – T. 447-48). Petitioner took more money out of the cabinet and put it in his pockets. (RC – T. 449). RC testified that petitioner closed the office door and put his hand down her pants. She begged him to stop and offered to let him take her car. The petitioner told her that he could "make it easy or he could make it hard." (RC – T. 450). RC did not struggle and allowed petitioner to pull down her pants. (*Id.*) Although he attempted to have sexual intercourse with her at that time, she testified that he was not erect and was only able to achieve slight penetration. (RC – T. 452-54).

RC testified that petitioner attempted to tie her hands with a cord, but eventually stopped. (RC – T. 454-55). Petitioner asked about RC's car and told her that he was not going to hurt her, he was only going to take the car. (RC – T. 456). RC gave him her keys, but he pushed her out the back door and toward the car. (RC – T. 456-57). Before leaving the bar, petitioner grabbed a bottle of Bacardi rum. (RC – T. 459). RC testified that when she got outside, she attempted to run away from petitioner, losing a shoe in the process. (RC – T. 457). Petitioner caught up with her and put her in the car. Petitioner warned RC not to attempt to escape. RC testified that petitioner forced her head down as he drove out of the parking lot. (RC – T. 457-58).

Ultimately, petitioner drove to a truck stop and pulled into a dark area. (RC – T. 460-61). He began to drink the rum and ordered RC to remove her pants. (RC – T. 461-62). He then performed oral sex on her and tried to have intercourse with her

5

again. (RC – T. 462-63). RC testified that he was not erect at first, but managed to achieve an erection and full penetration. She testified that petitioner also repeatedly put his fingers in her vagina and tried to kiss her, but RC turned her head. (RC – T. 463-64).

After the assault was over, petitioner got dressed and drove to the north side of Syracuse, got out of the car, told RC not to go to the police, and walked away. (RC – T. 464-65). RC got into the driver's seat and drove back to the bar. Once she was back in the bar, she called her father, her brother, the owner of the Dry Dock, and 911.[2] (RC – T. 465-66). The police responded to the scene and found that a file cabinet was open, there was cash on the floor, some desk drawers were pulled out. In the bar area, a chair was knocked over, and on the bar, there was a glass with brown liquid in it. In the parking lot, Detective Patrick Boynton found a single shoe. The other shoe and a bottle of Bacardi were found in RC's car.

RC drove to the truck stop with Detective Boynton. (RC – T. 471-72). She described the petitioner as a black male, who was around six feet tall, with a medium build and "bald shaven." (RC – T. 472). RC was brought to University Hospital, where she was examined, and where swabs and samples were taken from her genitals, mouth, fingernails, and pubic hair. (RC – T. 490-92, Galloway – T. 808-809). Registered Sexual Assault Nurse Examiner ("SANE") Nurse Ann Galloway assembled a sexual offence evidence kit. Nurse Galloway did not observe any injury or trauma to RC, other than a small scrape on her face, but testified that this would not be unusual,

---

[2] A tape recording of the 911 call was played for the jury. (T. 468).

notwithstanding a lack of consent. (Galloway – T. 779-80, 816, 818-19). RC was then taken back to the police station where she gave a statement. (RC – T. 493). A few days later RC showed a detective where the petitioner had released her after the attack. (RC – T. 494).

Petitioner was ultimately identified as a suspect and arrested on May 1, 2006. He was taken to the police department and placed in an interview room. He was advised of, and waived, his *Miranda*[3] rights. At first, petitioner stated that he could not remember the events of the night of April 25 and 26, 2006 because he "blacked out," however, he did state that he was in the vicinity of the Dry Dock and had smoked heroin with some friends. As they continued to question him, the officers confronted him with a story that they had spoken to a third party, who had spoken with petitioner's wife, the petitioner changed his story.[4] (Gilhooley – T. 663-64).

Petitioner then admitted being at the Dry Dock, where RC was bartending. He stated that two other customers were present, and one customer bought him a drink. However, petitioner also stated that this customer asked petitioner to obtain some cocaine and that he and RC gave petitioner money for drugs. (Gilhooley – T. 667). Petitioner claimed that RC took the money out of the cash register. (*Id.*) Petitioner then stated that he used the patron's cellular telephone to call for the drug delivery. The drugs were allegedly delivered to the bar, and petitioner stated that they all

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] The court gave a curative instruction, explaining to the jury that law enforcement officers sometimes use deception techniques to get suspects to talk. (T. 663-64).

snorted cocaine together. (Gilhooley – T. 667-68).

Petitioner also stated that the two other patrons left, and that he and RC began kissing and that they ultimately had sexual intercourse on the bar. (Gilhooley – T. 668). Petitioner alleged that he and RC took the bottle of alcohol from the bar and went outside where RC ran around and lost her shoe. (Gilhooley – T. 669). They got into RC's car and drove around looking for more drugs. Petitioner denied forcing RC into the car and claimed that they drove to the truck stop, smoked a cigarette, drank some more alcohol, and had sex again. (Gilhooley – T. 669-70). Petitioner stated that he had trouble maintaining an erection because of his consumption of drugs and alcohol. (Gilhooley – T. 670). Petitioner then drove RC to an area that was a block away from petitioner's house. Petitioner claimed that RC threatened to call the police if petitioner did not pay her money, but petitioner just got out of the car and went home. (*Id.*)

At that point, the officers took a break from questioning. (Gilhooley – T. 670-71). Although petitioner initially agreed to give a written statement, when he was provided with his *Miranda* rights in writing, he began to complain of chest pain and was taken to the hospital. (Gilhooley – T. 672-79). He never gave a written statement. At trial, the detective who took the petitioner's oral statement, Detective Rory Gilhooley ("Gilhooley"), testified as to the contents of the statement. (Gilhooley – T. 666-70).

On May 31, 2006, a detective collected a buccal swab from petitioner pursuant to a court order. A mixture of RC and petitioner's DNA was found on the swabs taken

8

from RC's mouth and labia. (Hum[5] – T. 975-78). Petitioner's DNA was also found on the straw that had been in the glass on the bar. (Hum – T. 986-87). The DNA on the rim of the glass, however, did not match the petitioner's DNA. (Hum – T. 988-89).

## II.  Generally Applicable Law

### A.  The AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *See also, e.g.*, *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001); *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008).[6] This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, __ U.S. __ , 131 S. Ct. 1388, 1398 (2011) (citations omitted).

---

[5] Kathleen Hum, a forensic scientist at the Onondaga County Center for Forensic Sciences, testified for the prosecution regarding the DNA samples taken from RC and from petitioner. (T. 899-1012).

[6] Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-113 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id.*

Under section 2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.'" *Id*. (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

**B.    Exhaustion**

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation and other citations omitted)); 28 U.S.C. § 2254(b)(1). The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the

10

claim. *Id.*; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

"A habeas petitioner has a number of ways to fairly present a claim in state court without citing 'chapter and verse' of the Constitution, including '(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.'" *Hernandez v. Conway*, 485 F. Supp. 2d 266, 273 (W.D.N.Y. 2007) (quoting *Daye v. Attorney General*, 696 F.2d 186, 194 (2d Cir.1982)).

## C.    Procedural Bar

A federal judge may not issue a writ of habeas corpus if an adequate and independent state-law ground justifies the prisoner's detention, regardless of the federal claim. *See Wainwright v. Sykes*, 433 U.S. 72, 81-85 (1977). A federal habeas court generally will not consider a federal issue if the last state court decision to address the issue "'rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Garvey v. Duncan*, 485 F.3d 709, 713 (2d Cir. 2007) (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)) (emphasis added). This rule applies whether the independent state law ground is substantive or procedural. *Id*.

There are certain situations in which the state law ground will not be considered "adequate": (1) where failure to consider a prisoner's claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750

11

(1991); (2) where the state procedural rule was not "'firmly established and regularly followed,'" *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *James v. Kentucky*, 466 U.S. 341, 348-349 (1984); and (3) where the prisoner had "cause" for not following the state procedural rule and was "prejudice[d]" by not having done so, *Wainwright v. Sykes*, 433 U.S. at 87. In *Garvey v. Duncan*, the Second Circuit stated that, in certain limited circumstances, even firmly established and regularly followed rules will not prevent federal habeas review if the application of that rule in a particular case would be considered "exorbitant." *Garvey v. Duncan*, 485 F.3d at 713-14 (quoting *Lee v. Kemna*, 534 U.S. at 376).

A state prisoner who has procedurally defaulted on a federal claim in state court may only obtain federal habeas review of that claim if he can show both cause for the default and actual prejudice resulting from the alleged violation of federal law, or if he can show that he is "actually innocent." *Clark v. Perez*, 510 F.3d 382, 393 (2d Cir. 2008) (internal quotation and citations omitted). "Cause" exists if "the prisoner can show that some objective factor external to the defense impeded counsel's effort to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice exists if there is a "reasonable probability" that the result of the proceeding would have been different absent the alleged constitutional violation. *Stickler v. Greene*, 527 U.S. 263, 289 (1999).

To demonstrate "actual innocence," a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him, but for the alleged constitutional violation. *Murden v. Artuz*, 497 F.3d 178, 194 (2d Cir. 2007),

*cert. denied sub nom. Murden v. Ercole*, 552 U.S. 1150 (2008); *Schlup v. Delo*, 513 U.S. 298, 327 (1995). "Actual innocence" requires factual innocence, not "legal" innocence. *Murden v. Artuz*, 497 F.3d at 194. A claim of actual innocence requires petitioner to put forth new, reliable evidence that was not presented at trial. *Cabezudo v. Fischer*, 05-CV-3168, 2009 WL 4723743, at *13 (E.D.N.Y. Dec. 1, 2009) (citing *Lucidore v. N.Y.S. Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000)); *Schlup v. Delo*, 513 U.S. at 316, 327-328.

## III.   DNA Evidence (Ground 1)

### A.   Legal Standards

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a petitioner may not challenge an allegedly unconstitutional search and seizure in an application for federal habeas relief. *Id.* at 481–82; *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). The Second Circuit has determined that review of a Fourth Amendment claim in a habeas corpus application is proper only if: (1) the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (2) the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in that process. *See Capellan*, 975 F.2d at 70; *Gates v. Henderson*, 568 F.2d 830, 839–40 (2d Cir. 1977).

New York provides an approved mechanism for litigating Fourth Amendment claims. *See Capellan*, 975 F.2d at 70 (citing N.Y. Crim. Proc. § 710.10 et seq.); *Blake*

*v. Martuscello*, No. 10-CV-2570, 2013 WL 3456958, at *5 (E.D.N.Y. July 8, 2013) (citing N.Y. Crim. Proc. Law § 710.10 and finding that the Second Circuit has explicitly approved New York's procedure for litigating Fourth Amendment claims) (citing *inter alia Capellan*, 975 F.2d at 70 n.1) (other citations omitted)).

## B.    Application

Petitioner argues that the bucal swab of his mouth to obtain a DNA sample was taken in violation of the Fourth Amendment, that the court had no authority to order the sample taken, and that the incorrect "procedure" was used. (Pet. at CM/ECF p. 14). Petitioner never raised this claim in any state court.  Without addressing the issues of exhaustion and procedural default, the court finds that petitioner's first claim should be dismissed based upon *Stone v. Powell*.

Petitioner's claim that somehow the DNA sample from his mouth was improperly taken and should have been suppressed is the type of Fourth Amendment claim to which *Stone v. Powell* applies.  As stated above, New York State affords criminal defendants the opportunity to move to suppress evidence taken in violation of the Fourth Amendment.  On May 18, 2006, the prosecutor made the application for the sample to the County Court Judge who originally presided over the petitioner's trial. (Trial Transcript ("T") at 2) (Dkt. No. 11-5).  Defense counsel objected, and the court stated that "the case law is pretty well settled that it is a reasonable request and not particularly invasive, so I'm going to grant the order." (*Id.*)

Defense counsel did move to suppress statements made by petitioner, his identification, and "physical evidence" taken from petitioner. (Dkt. No. 11 at CM/ECF

pp.36, 40-41; Pet'r's Pretrial Motion). There was a lengthy suppression hearing, beginning on September 29, 2006. (T. at CM/ECF pp.27- 29, 54- 108, 111- 209). If there was a constitutional infirmity of some kind in taking the DNA sample, petitioner had plenty of time to challenge the procedure. Petitioner can not claim that there was an "unconscionable breakdown" in those procedures. The fact that petitioner did or did not avail himself of the opportunity to challenge the admission of the DNA does not change the result under *Stone v. Powell*. All that is required is that the petitioner have an "opportunity" to challenge the admission of the evidence. Thus, petitioner's first ground may be dismissed based upon *Stone v. Powell.*

## IV.   **Prosecutorial Misconduct in the Grand Jury**

### A.   **Exhaustion/Procedural Default**

The petitioner's indictment included the incident that he challenges in this petition, together with another incident of similar conduct with a different victim, occurring on a different day. This other conduct was contained in Counts 7, 8, and 9 of the indictment. Petitioner claims that the prosecutor had the DNA reports for these other charges for eight months, but still put both cases before the same grand jury. Respondent argues that this claim is not exhausted because petitioner failed to raise it in constitutional terms in the Appellate Division. This court does not agree.

In his brief to the Appellate Division, petitioner cited New York state law in support of his grand jury claim. However, he also stated that "[t]he error is one of constitutional dimension. Both the New York and United States Constitutions hold that no person shall be held to answer for a capital or otherwise infamous crime unless

15

on indictment of a grand jury (NY Const art I, § 6; US Const Amend V)." (Dkt. No. 11-4, Pet'r's Br. at 14-15). Petitioner's counsel also stated that "[o]ne has a *federal and constitutional right* to fundamentally fair Grand Jury proceedings, and the finding of actual prejudice by the lower court meant actual deprivation of that right." (*Id.*) (emphasis added). Petitioner included the identical claim in his application for leave to appeal to the New York Court of Appeals. (Dkt. No. 11-4 at CM/ECF pp.133-34). Thus, to the extent possible, petitioner attempted to exhaust the grand jury claim.

Respondent based his argument on New York State law. The Appellate Division considered the petitioner's grand jury claim on the merits, finding that the prosecutor's conduct was consistent with state law, and noted that the trial judge severed the three counts and granted separate trials. The court also stated that, contrary to petitioner's argument, dismissal of the indictment was not warranted based on potential prejudice and concluded that "the circumstances of this case do not warrant the 'exceptional remedy of dismissal'" of the indictment." Although the Appellate Division based its decision on New York State law, petitioner did give the court the "opportunity" to consider any federal claim that existed. Thus, petitioner exhausted his grand jury claim.

### B. Non-Cognizable Claim

Even though petitioner exhausted his state court remedies, his grand jury claim may still be dismissed. As argued by respondent, the Fifth Amendment right to be tried for a felony only upon a Grand Jury indictment was not incorporated into the Due Process Clause of the Fourteenth Amendment, and it does not apply to the states.

Because a state criminal defendant has no federal constitutional right to be charged by a grand jury, irregularities in grand jury proceedings, including the presentation of prejudicial evidence, are not cognizable in a federal habeas corpus petition. *Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989). *See Shapard v. Graham*, No. 10-CV-6700, 2012 WL 414117, at *2 (W.D.N.Y. Feb. 8, 2012) (claims of deficiencies in state grand jury proceedings are not cognizable in a federal habeas proceeding) (citing *inter alia Davis v. Mantello*, 42 F. App'x 488, 490-91 (2d Cir. 2002)); *Klosin v. Conway*, 501 F. Supp. 2d 429, 436-37 (W.D.N.Y. 2007) (deficiencies in grand jury proceedings cured by petit jury conviction and not cognizable in federal habeas corpus proceeding) (citations omitted).

Petitioner claims that the prosecutor should not have presented evidence of both incidents to the same grand jury. Upon petitioner's counsel's motion, the trial court severed and granted separate trials.[7] Petitioner was convicted after a jury trial in this case. Therefore, petitioner's grand jury claim is not cognizable and may be dismissed.

---

[7] Petitioner has submitted a transcript from an April 28, 2008 court appearance on the severed charges. (Dkt. No. 1 at CM/ECF pp.60-64). Petitioner was represented by a different trial attorney. The prosecutor (the same as in the instant case) explained to the judge that the first attempt at trying the case resulted in a mistrial relating "to the jury [they] picked," and the victim was reluctant to testify. (*Id.* at 61). The prosecutor indicated that petitioner was already serving a 110 year sentence on this case and could not serve any more time if he were convicted again. (*Id.*) Because of this, the prosecutor let the victim make the choice not to testify, and petitioner's counsel moved for, and was granted dismissal of the action with prejudice. (*Id.* at 61-63). The prosecutor consented to the dismissal on the record. (*Id.* at 63). The court notes, however, that the dismissal had nothing to do with petitioner's innocence of the crime.

## V.    Ineffective Assistance of Counsel

### A.    Exhaustion

Petitioner claims that his trial attorney was ineffective for two reasons. (Dkt. No. 1 at CM/ECF p.20).  He states that his attorney "only made one objection on [sic] DNA order." (*Id.*)  He refers the court to "attach[ed]" pages 1-3 and a date of May 18, 2006.  Petitioner appears to be complaining about the prosecutor's motion to the County Court Judge to take a bucal swab from petitioner. (Dkt. No. 1 at CM/ECF pp.28-31).  That is the only document attached to the petition, reflecting an appearance date of May 18, 2006.

The second basis for petitioner's ineffective assistance of counsel claim appears to be that his trial attorney failed to make a motion for a "lesser included offense." (Dkt. No. 1 at 20).  Petitioner refers the court to "page(s) 1014-1015." (*See* Dkt. No. 1 at CM/ECF pp.52-53 – corresponding to pp.1014-15 of the trial transcript).  These pages reflect the motions made by petitioner's counsel at the end of the prosecution's case.  Petitioner's counsel made a motion to dismiss the rape charges, and the court denied the motion stating that it was "denied as to all counts.  And it's certainly sufficient to support any lesser included offenses." (*Id.*)

Although it is not completely clear what conduct by counsel petitioner is trying to challenge, it is clear that he never raised an ineffective assistance of counsel claim in *any* New York State court prior to raising it in this petition.  Therefore, his ineffective assistance claim is unexhausted.

18

## B.    Procedural Default

Although petitioner has failed to exhaust his state court remedies, he cannot return to state court to exhaust his claim.  He has already filed a direct appeal.  He cannot return to the Court of Appeals because New York permits only one application for direct review. *Oquendo v. Senkowski*, 452 F. Supp. 2d 359, 368 (S.D.N.Y. 2006) (citing *Spence v. Superintendent*, 219 F.3d 162, 169-70 (2d Cir. 2000); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)); N.Y. Rules of Court, Court of Appeals § 500.20. Petitioner would also be unsuccessful in moving to vacate his conviction pursuant to N.Y. Crim. Proc. Law § 440.10 because the claim would be dismissed due to petitioner's unjustifiable failure to raise the record-based claim on direct appeal. *Id.* § 440.10 (2)(c).  This procedural bar is independent and adequate, and is consistently applied. *See Clark v. Perez*, 510 F.3d at 393 (discussing § 440.10(2)(c)).

When petitioner has failed to exhaust his state court remedies, but return to state court is foreclosed, the claim is "deemed" exhausted, but is subject to a procedural default analysis. *Bossett v. Walker*, 41 F.3d 825 (2d Cir. 1994) (citing *Grey v. Hoke*, 933 F.2d at 120-21).  In order to overcome the procedural default, petitioner would have to show cause for his failure to raise this issue and prejudice resulting from the constitutional violation.  Petitioner has not shown cause for his failure to challenge his trial counsel's effectiveness.

Ineffective assistance of appellate counsel could establish cause for his failure to raise the ineffective trial counsel issue on direct appeal. *Murray v. Carrier*, 477 U.S. at 488.  In the section of the form-petition which asks why petitioner did not raise

his claims in state court, he writes "ineffective appeal [sic] counsel" and "ineffective trial counsel." (Dkt. No. 1 at CM/ECF p.20).  He does not elaborate upon these two conclusory statements, and petitioner had new counsel on appeal.  In any event, in order to establish that ineffective assistance of appellate counsel was "cause" for his failure to raise the ineffective trial counsel claim, petitioner would have had to exhaust the appellate counsel claim separately. *Id*. at 488-89.  Petitioner did not do so in this case.  Thus, he cannot establish cause for the procedural default.[8]  Because petitioner has not established cause, the court need not address prejudice.

Finally, petitioner cannot show that he is actually innocent of the charges. There is no new evidence demonstrating that petitioner is "factually innocent" as required.  Thus, petitioner cannot overcome the procedural default, and his ineffective assistance of trial counsel may be dismissed.

## VI.  <u>Grounds 4 -8</u>

### A.    Exhaustion

Based upon the state court records filed by respondent, none of petitioner's

---

[8] The court would also point out that his attorney's omission of an issue on appeal may have been an attempt to focus the court's attention on petitioner's strongest claims.  Generally, such decisions are strategic and do not rise to the level of ineffectiveness. *See e.g. Jones v. Barnes*, 463 U.S. 745 (1983) (appellate counsel not ineffective for failing to raise every nonfrivolous issue requested by defendant). This proposition is supported by petitioner's own exhibits, which include three letters that appellate counsel wrote to petitioner during the pendency of his direct appeal. (Dkt. No. 1 at CM/ECF pp.35-37).  These letters respond to petitioner's submissions of "packets" of information and suggestions to counsel about arguments on appeal.  In his letters, counsel attempts to explain to petitioner the reasons that counsel declined to raise certain arguments advanced by petitioner.  Counsel's explanations are reasonable, and he clearly chose to raise what he believed were petitioner's strongest arguments.  Counsel encouraged petitioner to file a pro se section 440.10 motion to vacate his conviction if he believed that other grounds needed to be raised.  It appears that petitioner did not take counsel's advice.

remaining grounds were raised in any state court, rendering them all unexhausted. Petitioner has attached a document to his traverse that appears to be a "pro se supplemental brief" that was allegedly submitted to the Appellate Division. (Dkt. No. 19-2 at CM/ECF pp.61-68). In this document, he raises some of the claims in grounds 4-8 above. He mentions problems with the "expert testimony" of Kathleen Hum[9] and argues that the court should have granted a mistrial based on some issues with the dismissal of jurors.[10] (*Id.* at CM/ECF p.63-64).

The cover letter submitted with this pro se filing is from the Appellate Division, Fourth Department, dated May 23, 2011. (*Id.* at CM/ECF p.59). The letter states that the court is returning petitioner's supplemental brief because it was not properly filed. (*Id.*) Petitioner failed to file sufficient copies, and failed to properly bind his submission. (*Id.*) The next document is a letter from petitioner, dated May 24, 2011, stating that all ten copies of his brief were mailed on May 20, 2011, but stated that only eight copies were mailed to the Appellate Division, another was mailed to the prosecutor, and the last copy was mailed to petitioner's appellate counsel. (*Id.* at CM/ECF p.60). The letter is stamped "RECEIVED" May 26, 2011. (*Id.*) The pro se

---

[9] The petition challenges the expert testimony of *Nurse Galloway*, not Kathleen Hum. (Pet. at CM/ECF p.40). Thus, the expert testimony claim is still unexhausted.

[10] In this supplemental brief, petitioner also raises facts and alleged claims based upon the dismissed counts of his indictment, arguing that somehow, a stray comment by Hum about a "bite mark" that was not present in this case prejudiced petitioner. The portion of Hum's testimony cited by petitioner would not have in any way indicated that there were additional counts in the indictment.

brief itself is stamped "FILED" on May 23, 2011.[11]

It is unclear whether the petitioner resubmitted the appropriate amount of copies, and it is therefore, unclear whether the Appellate Division considered petitioner's pro se supplemental brief because the lack of sufficient copies was only one of the two deficiencies listed in the Appellate Division's May 23, 2011 letter. In order to exhaust a claim, the document containing the argument must be fairly presented. *Daye, supra*. If the court rejected the brief and did not consider the contents, the issues raised therein were not "fairly presented." However, even assuming that the court considered the pro se brief,[12] petitioner raised only New York state evidentiary issues, cited no federal case law and no federal constitutional provisions. None of the methods of raising federal constitutional claims outlined in *Daye* were utilized in petitioner's papers. Additionally, to exhaust these claims, petitioner would have been required to raise the constitutional claims in his application to appeal to the New York Court of Appeals, and there is no indication that he did so. Thus, even if the court assumes that the document was considered by the Appellate Division, petitioner has still failed to exhaust grounds 4-8.

Petitioner cannot return to state court to raise any of the claims because he will be procedurally barred from doing so. All of the claims are based upon evidence in

---

[11] This stamp was likely the original stamp placed on the document prior to sending the document back to petitioner with the original cover letter of the same date.

[12] There is no evidence that the court considered the brief. There is no mention of a pro se submission in the Appellate Division's order, and the order discusses only the claims raised by counsel. There is no mention of other claims, even to state that they were "summarily" rejected. *People v. Davis, supra.*

22

the record, and if they were to be raised anywhere, they should have been raised on direct appeal.

## B.   Procedural Default

As stated above, petitioner has not shown cause for his failure to raise these claims on direct appeal.  He has not exhausted a claim of ineffective appellate counsel, and such a claim would be unlikely to succeed in any event.   Appellate counsel presented the claims that he believed were petitioner's strongest arguments on appeal as evidenced by the letters that he wrote to petitioner in response to petitioner's information and requests.  There is no indication that counsel chose less meritorious claims in favor of those which would have succeeded.  Any other choice is a matter of strategy. *See Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 790 (2011) ("Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect."'") (internal citations omitted).

Petitioner does not claim that he has "new" evidence showing that he is "factually" innocent.  Petitioner's defense to the charges was that the sexual acts in which he engaged with the victim were with her consent.  Essentially, the jury believed the victim.  Her testimony and the testimony of the bar patrons who were at the Dry Dock Grill shortly before the incident were consistent with each other and

23

were not consistent with the petitioner's version of the events. The petitioner's DNA profile matched the sample that was found on the straw in the drink that was left on the bar, placing him at the bar that evening. (Hum – T. 987). Additionally, petitioner's DNA profile matched the samples taken from the victim's mouth and labia. (Hum – T. 970-86). The witness stated that the result was a mixture of the victim's and the defendant's DNA. (Hum – T. 984).

Thus, petitioner's remaining claims may be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is further

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: September 5, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge